## STATE OF MARYLAND, USE OF CORA J. GAVER, *vs.* HARMON L. GAVER AND FREDERICK W. OBERDERFER.

*Statutory and official bonds; equitable plaintiffs; delivery and acceptance; filing of official bond; mistake; intent; equitable relief.*

Where a bond is not an official bond, nor one required by law to be given, the State has no interest in it.          p. 253

Where a bond is one required by law, but the statute does not specify to whom it shall be made payable, it may, where many persons are interested, be taken in the name of the State; and suit may be brought on it, by those for whose protection it is required, without obtaining the authority of the State for that purpose; in such cases the party for whose use the suit is brought is regarded as the real plaintiff, although, strictly and technically speaking, the State is the plaintiff.          p. 256

But the State may not, without its consent, be made the obligee in a bond in which it has no interest and which is not required by law to be executed.          p. 256

A bond in order that it may be a binding obligation must not only be executed by the obligors, but must be delivered to and accepted by the obligee.          p. 258

Statutory or official bonds made payable to the State can not become effective until they are accepted by those duly authorized to accept them.          p. 258

Where bonds are made payable to the persons for whose protection they are required, the approval and filing takes the place of delivery, and the assent of the obligee is not required.          p. 258

But where a bond is made payable to the State, not to subserve any interest of the State, but as trustees for others, it does

not become operative until it has been duly accepted by the State, acting through its appropriate and duly accredited agents.                                               p. 260

Where a guardian transferred funds belonging to the ward to J. W. G. "as custodian and holder for her," and the said J. W. G. with H. L. G. and F. W. O. executed their bond, in double the amount of said funds to be paid to the State or its attorney, which bond recited that if the said bounden J. W. G., as custodian of the funds for the guardian, should faithfully account with the Orphans' Court, etc., then the obligation should cease, etc.; *held,* that as the bond was not given for the protection of the State, nor in accordance with any law requiring it, and as no one was authorized to receive and accept it on behalf of the State, and it could not become operative without delivery and acceptance, it was not a bond of the appellees to the State.  .                         p. 260

Where it was the intention of the obligors and guardian in a bond to have the bond made payable to the guardian, and, through the mistake of the draftsman, the bond was drawn to the State as obligee, and delivered to the guardian or someone for him, and he accepted it, believing that the bond was payable to him, a Court of equity, upon a proper bill filed, can correct the mistake and reform the bond so as to make it conform to the intention of the parties and enforce it against the obligors.                                          p. 260

*Decided April 4th, 1911.*          ⁚

· Appeal from the Circuit Court of Frederick County (URNER, C. J., MOTTER AND HENDERSON, JJ.).

The cause was argued before BOYD, C. J., BRISCOE, PEARCE, SCHMUCKER, THOMAS and PATTISON, JJ.          ·

*Leo Weinberg* (with whom was *Frank L. Stone,* on the brief), for the appellant.

*Glenn H. Worthington* (with whom was *Reno S. Harp,* on the brief), for the appellees.

THOMAS, J., delivered the opinion of the Court.

This suit was brought in the name of the State of Maryland, for the use of Cora J. Gaver, guardian, against the appellees as sureties on a bond alleged to have been given by them, and the appeal is from a judgment in favor of the defendant on a demurrer to the declaration.

The first count of the *narr.* alleges that the said Cora J. Gaver was appointed guardian of Grace M. Main and others by the Orphans' Court of Frederick County on the 21st of January, 1903, and that she duly qualified as such guardian; that on the 23rd of March, 1905, she transferred to Joseph W. Gaver, "as custodian and holder for her", the sum of twenty-five hundred dollars, and that on the same day the said "Joseph W. Gaver, as principal, and Harmon L. Gaver and Frederick W. Obenderfer, as sureties, executed under their hands and seal" the following bond:

"MARYLAND, *Sc.:*

"*Know All Men By These Presents,* That we, Joseph W. Gaver, Harmon L. Gaver and Frederick W. Obenderfer, of Frederick county, are held and firmly bound unto the State of Maryland in the sum of five thousand ($5,000) dollars, current money, to be paid to the State aforesaid or its certain attorney, to which payment, well and truly to be made, we bind ourselves, our heirs, executors and administrators, jointly and severally, firmly by these presents.

"Sealed with our seals, and dated this 23rd day of March, in the year of our Lord one thousand nine hundred and five.

"The condition of the above obligation is such, that if the above bounden Joseph W. Gaver, as custodian and holder of the sum of twenty-five hundred dollars ($2,500) for Cora J. Gaver, Guardian to Grace M. Main, Oscar C. Main, Nannie N. Main, Roy E. G. Main, and Melvin J. Main, heirs and representatives of Jonathan C. Main, late of Frederick county, deceased, shall faithfully account with the Orphans' Court of Frederick County, Maryland, as directed by law, for the management of the property and estate of the infants under her care, and also shall deliver up said property, agreeably to the order of the said Court, or the directions of law, and shall in all

respects perform the duty of custodian and holder of the funds of said Guardian to the said Grace M. Main, Oscar C. Main, Nannie L. Main, Roy E. G. Main and Melvin J. Main, infants as aforesaid, according to law, then the above obligation shall cease; otherwise it shall remain in full force and virtue."

This count further charges that the said Joseph W. Gaver died intestate on the 14th of November, 1909; that the Orphans' Court of Frederick County, on the petition of the said Cora J. Gaver, guardian, passed an order, on the 21st of December, 1909, requiring the defendants and the administrators of the said Joseph W. Gaver to deliver said sum of $2,500 into Court to be paid to her, and that a copy of said order was duly served on the defendants and on said administrators, but that the defendants failed and refused to deliver up said sum of $2,500 as required by said order.

The second count, after alleging that the said Joseph W. Gaver, now deceased, and the appellees "entered into and executed" the bond set out in the first count, charges that the appellees by said bond "obligated themselves * * * for the performance in all respects of the duty of the said Joseph W. Gaver as custodian and holder of the funds; that it was the duty of the said Joseph W. Gaver as custodian and holder to pay over and deliver to said Cora J. Gaver, guardian, when demand was made therefor; and, demand having been made and refused, it then became and was the duty of" the appellees, "under the terms of said bond, to deliver and pay" said fund to said Cora J. Gaver, guardian, but that the appellees failed and refused to pay same.

As the bond sued on is set out in and made a part of both counts of the declaration, the first question to be determined is: Can a suit be maintained on it against the sureties? It is not an official bond, or one required by law to be given. It was not executed for the protection of the State, but for the benefit of Cora J. Gaver, guardian. The State, therefore, has no interest in the bond, and it is conceded that there is no statute authorizing such a bond to be made payable to the State.

In the case of *Kiersted et al. v. The State,* 1 G. & J. 231, the bond was executed to the State of Maryland by an applicant for the benefit of the insolvent laws. The statute required the bond to be given, but did not authorize it to be taken in the name of the State, and it was contended that the State could not, therefore, maintain a suit on it. The Court, in disposing of this contention, said: "The first and chief question arising out of them is a consideration whether actions can be maintained on these obligations, inasmuch as they have been taken in the name of the State of Maryland, and no express authority is given by law so to take them.

"The Act of 1805, ch. 110, is the first general insolvent law enacted in this State, to which there have been many supplements; and since then various insolvent acts to suit the situation of the City and County of Baltimore have been passed. All have been examined by the Court, as well as some in favor of individuals, before and since 1805. In none of those acts is there any specific provision for taking these bonds of the insolvents in the name of the State, although by the Act of 1805, and several other acts, the Courts, judges and commissioners are to take of the imprisoned debtors at the time of their discharge bonds conditioned for their appearance to answer the allegations of their creditors, in penalties to be prescribed, and with security to be approved of by them. Notwithstanding, the manner of taking these bonds is no where specifically directed; we are assured upon full enquiry that they have been invariably passed to the State of Maryland for more than twenty years past, whether taken by the Courts, the judges or the commissioners of insolvent debtors for the City and County of Baltimore. What has produced this uniformity, it is not easy to say, unless it has been brought about by implicity following the example of the Courts and judges, upon whom it first devolved to execute these Acts of Assembly. As no person was designated in whose name the bonds were to be given, it is probable the Courts and judges were prompted to the course pursued by the consideration, that the law in

this particular could not be executed, without an obligee was supplied by them, and by reflecting that for permanency and convenience none could be selected, more suitable than the State itself, to which all official bonds were given, and other kinds of bonds where a multiplicity of persons are concerned. And it may be that they were conducted to this resolution by reasoning upon the supposed intention of the Legislature that these bonds should be taken in the name of the State, from the fourth section of the Act of 1805, ch. 110, which directs the trustees of insolvents to give bond to the State. Whatever may have led to the practice, its consistency fully established the cotemporaneous construction of the first act in this system of laws, and we think it has too long obtained to be at this time shaken and disturbed. And we further think that to promote the execution of similar legislative provisions it may be well received as a settled rule for the government of our Courts of justice, that obligations in which many persons are interested, be taken in the name of the State of Maryland whenever the law is silent in naming the obligees to whom they are to be given." In the case of *Ing* v. *State,* 8 Md. 287, the suit was on an appeal bond, and in reply to the objection that it was not properly brought in the name of the State, CHIEF JUDGE LE GRAND said: "The 7th section of the Act of 1835, ch. 380, provides that when any County Court, as a Court of equity, shall require bond, with or without security, to be given in any case, and the parties concerned therein shall be numerous, or it shall for other reasons appear proper to the Court to take bond in such form, such bond may be taken in the name of the State as obligee, and be sued by any person interested as public bonds may; and even prior to the passage of the Act of 1835 the Court of Appeals held, in *Kiersted* v. *State,* 1 G. & J. 231, that the uniform practice for twenty years allowed persons interested to bring suits on bonds taken in the name of the State, although the Acts of Assembly under which they are required to be executed contain no specific provision for making them to the State, or give to the party, in lan-

guage, the right to sue. These references are sufficient to show that the suit was properly brought." In the case of *State* v. *Norwood,* 12 Md. 177, the suit was brought in the name of the State on a bond given to the State by the clerk of the Court of Common Pleas for the City of Baltimore, and it was insisted by the defendants that it could not be maintained unless the equitable plaintiff could show that he had obtained authority from the State for that purpose. The Court, after quoting from the cases we have cited, said: "The laws which provide for the execution of bonds similar to the one before us do not require them for the puropse of protecting the rights of the State alone. They are also designed to secure the faithful performance of official duties, in the discharge of which individuals and corporations have a deep interest, and, therefore, they should have the privilege of suing such bonds for injuries sustained by them through the negligence or mal-conduct of the officers. Such doctrine, in regard to public official bonds, we consider as having been long established in Maryland, whatever may be the law elsewhere. And, entertaining these views, we cannot agree with the defendants'. counsel in supposing the present equitable plaintiffs could not institute this suit, because they had not obtained authority from the State for that purpose."

These cases hold that where a bond is required by law, and the statute does not specify to whom it shall be made payable, it may, where many persons are interested, be taken in the name of the State, and that suit may be brought on it by those for whose protection it is required, without obtaining the authority of the State for that purpose. In such cases the party for whose use the suit was brought is regarded as the real plaintiff, although, strictly and technically speaking, the State is the plaintiff. But we have been unable to find any authority for the proposition that the State may, without its consent, be made the obligee in a bond in which it has no interest and which is not required by law to be executed. In the case of *United States* v. *Pumphrey,* 11 App. Cases, 44 (D. C.), the bond was given to the United States and

approved and accepted by the Commissioner of Indian Affairs for the faithful performance of contracts of one of the obligors with certain Indians. The Court, after holding that notwithstanding the bond was not required by any statute, the United States may, "as a body politic, within the sphere of the constitutional powers conferred upon them and through the instrumentality of the proper department to which these powers are confided, enter into contracts not prohibited by law, when appropriate to the just exercise of those powers," said: "It may be conceded, however, that if the United States had no special power of supervision and control over the privileges and interests of these Indians, as such, the bond would be invalid; for the United States can not assume guardianship of an individual and make contracts concerning his private affairs that they may enforce, or that he, even, might enforce for his own benefit, as can be done, in some instances, by a third person, in the case of a contract made between others for his express benefit, or to which he may, in some proper manner, be privy. It follows, then, that the right of the United States to recover, by virtue of this bond, either to the extent of their own damage incurred in the return of the Indians to their reservation, or for the benefit of the Indians themselves, to the extent of the special damages sustained by them through the breach of their contracts as named in the bond, must depend upon the nature of the relations of said Indians to the Government, its powers of control over and its duties and obligations to them." And in the case of *State* v. *Shirley,* 1 Irer. 597 (N. C.), suit was instituted in the name of the State of North Carolina at the relation of one Braddy on a constable's bond. The Court held that the constable had not been lawfully appointed; that the magistrate who received the bond had no authority as such to accept it, and that there could be no judgment at law upon the bond. JUSTICE GASTON, in that case, after referring to cases "in which, without evidence of formal acceptance, obligations made directly to a State, or to the United States, for the payment of money or the performance of other

duties due to them in their corporate capacity, have been
upheld as bonds on the ground of presumed acceptance,"
said: "The instrument before us does not profess to be made
for the benefit of the State *as such*.   It is avowedly made to
secure the interests of all persons who shall entrust the
defendant Shirley with the collection of debts, and made to
the State as a trustee for these persons.   True, the State may
be said in common parlance to have an interest in the faithful
performance of these duties, because the performance of them
is for the advancement of right.   But the State has not an
interest therein in its proper character *as a State*.   If indi-
viduals may, without permission, thus make the State their
trustee, what limit can be set on the exercise of this liberty?
Why may not everyone—every firm—every voluntary asso-
ciation—every corporate body—nay, every foreign State—
should they choose—take engagements for the protection of
their interests in the name of the State?   If this be done, is
it not manifest that the State may become involved in respon-
sibilities and duties, wholly alien from the legitimate pur-
poses of government, and its honored name may be bandied
about in the contests of private litigants, like the John Doe
and Richard Roe in an action of ejectment?"

Independent of the question of the right of individuals to
make the State, without its consent, the obligee in bonds
executed for their private ends, there is a more serious objec-
tion to the instrument sued on in this case.   Every bond, in
order that it may be a binding obligation, must not only be
executed by the obligors but must be delivered, and it must
be accepted by the obligee.   *Bac. Abr.*, Obligations C.   Statu-
tory or official bonds made payable to the State can not become
effective until they are accepted by those duly authorized to
accept them.   Where they are made payable to the persons
for whose protection they are required, the approval and
filing takes the place of delivery, and the assent of the obligee
is not required.   It is said in *Murfree on Official Bonds*,
section 46, that where a bond is made payable to the State,
"not to subserve any interest of the State, but as trustee for

others," the bond "does not become operative at all until it
has been duly accepted by the State acting through its appro-
priate and duly accredited agents." In the case of *State* v.
*Shirley, supra,* the Court said: "But the magistrate who·
received this bond in behalf of the State acted wholly without
authority. He not only had no express delegation of power
to take it, but he was acting altogether *without his official
sphere* in relation to the subject-matter. His acceptance of
the instrument imparted to it no more validity, than it would
have received from the acceptance of any, the humblest, indi-
vidual in the land." In the case of *Harris* v. *Register,* 70
Md. 109, an appeal bond given to the appellees as obligees
was executed with only one surety, and the Court held that
it was not such a bond as the statute required, and that "The
approval of the bond by the clerk gave it no additional effici-
ency, because it was not such a bond as he was authorized to
approve upon an appeal from a final judgment." After stat-
ing that "whilst the bond did not conform to the statute, it
by no means follows that it might not have been a good volun-
tary bond, had it met the other requirements necessary to
give validity to instruments of that character," JUDGE
McSHERRY further said: "In the case now before us had the
bond sued on been delivered to the appellees by the obligors,
we have no doubt whatever that it could have been recovered
on upon proof of a breach of its condition. But delivery is
an indispensable requisite to the validity of a voluntary
bond. It must be delivered by the party whose bond it is,
to the other (*Bac. Abr.,* Obligations C) ; though the delivery
and acceptance may be by attorney. In statutory bonds the
approval and filing take the place of delivery. The law does
not in such case require the assent of the obligee. *Burgess*
v. *Lloyd,* 7 Md. 178. The bond in this case was not delivered
to the obligees or to any agent or attorney of theirs. It was
never intended to be so delivered. Its delivery to the clerk
was not such a delivery as to make it a valid voluntary bond,
because he was not the agent of the obligees and he did not
receive the bond in any such capacity. There was, there-

fore, in fact, no legal delivery of the bond at all, and it did not, as it could not without delivery, become binding on the surety as a voluntary obligation." In the case of *State* v. *Oden,* 2 H. & J. 108, note, the defendant executed his bond to the State for a sum due J. S. The bond was presented to the agent of the State who refused to accept it. Suit was brought on the bond in the name of the State for the use J. S. and the General Court held that it was not the deed of the defendant. In the case at bar the bond, as we have said, was not given for the protection of the State, or in accordance with any law requiring it to be executed for the benefit of the equitable plaintiff. No one was authorized to receive and accept it on behalf of the State, the obligee, and as it could not become operative without delivery and acceptance, it is not the bond of the appellees to the State. See, in addition to the cases cited above, *Burgess* v. *Lloyd,* 7 Md. 178; *Brown* v. *Murdock,* 16 Md. 521; *State* v. *Jarrett,* 17 Md. 309.

It appears, however, from the allegations of the *narr.* and from the terms of the bond that Joseph W. Gaver received from the equitable plaintiff the sum of $2,500, which belonged to her as guardian of Grace M. Main and others, and that the bond was given to secure the payment of said sum to the guardian. Under such circumstances the bond should have been made payable to the guardian, and was no doubt intended to be so made, as it was evidently given to secure to her a sum for which *she* was bound to account. If it was the intention of the obligors and the guardian to have the bond made payable to her, and through the mistake of the draughtsman it was given to the State as obligee, and it was delivered to the guardian, or to some one for her, and she accepted it, believing that it was payable to her, there is no reason why, upon a proper bill filed, a Court of equity could not correct the mistake, reform the bond so as to make it conform to the intention of the parties, and enforce it against the obligors. In the case of *Coke* v. *Husbands,* 11 Md. 492, the draughtsman of the deed testified

that he "received instructions as to the interest intended to
be conveyed by the deed, and it was intended to convey
. thereby the interest which each (party to the deed) actually
had at the time, and not what either might acquire by the
death of the other," and that he "thought that the deed only
conveyed that interest, and would think so now but for the
doubts of counsel." The Court said in reference to that
evidence: "Now, what other construction can this language
receive than this, that he was instructed to prepare a deed,
conveying a certain interest in the property, and, by mistake,
made it to embrace a greater interest than the parties
intended," and held that the deed should be reformed. In a
note to *Wood* v. *Patterson et al.*, 4 Md. Ch. 335, and in 34
*Cyc.*, page 910 b, and page 915 d, many cases are collected
showing under what circumstances deeds and other instru-
ments may be reformed. It is stated in 24 *Ency of Law* 654,
that "A written instrument may be corrected by supplying
the omission of the name of a party, or inserting provisions
which have been omitted. Similarly, where a party of the
consideration is omitted, it may be inserted, or the omission
of a seal may be supplied. Where the name of a party is
incorrectly set forth, the correct name may be substituted, or
the name of the true party may be substituted for a name
inserted by mistake," and on page 656 it is said: "Equity
may reform instruments against sureties as well as against
principals." In *Murfree on Official Bonds,* section 445, the
author says: "It is a well-known power of Courts of equity
to reform irregular and defective obligations and other instru-
ments, and its jurisdiction in this regard has been very freely
exercised." In the case of *Neinninger* v. *State*, 34 N. E.
Rep. 633, the name of the party making the complaint in a
bastardy case was inserted in the recognizance as Maggie
Kyne instead of Maggie Cross, and the Supreme Court of
Ohio said: "After a careful and somewhat extended examina-
tion of the question, we have arrived at the conclusion that
a written instrument executed by a surety, which by mistake
fails to express the actual agreement and intention of the

parties, may be reformed upon parol proof, like other writ-
ten instruments, and then enforced against the surety; and
such mistake and the actual agreement may be established
by parol proof." The same principle was applied in the
case of *Henkelman* v. *Peterson,* 154 Ill. 419., 40 N. E. Rep.
359, where by mistake no seals were attached to an injuntion
bond, and the Court, after a careful review of the author-
ities, stated: "In principle we can see no difference in the
reformation of an instrument to make it express the inten-
tion of the parties whether a surety is a party to it or not.
The consideration that extends to the principal also extends
to the surety. The rights of the obligee are the same as to
each, and each owes him the same duty. The bond in this
case, with the evidence in the record, clearly shows it was
intended to be sealed, and made a sufficient bond. Its recitals
carry conviction that such was the intent. Neither ignorance
of fact nor law could be relied on to show the contrary, and
to declare an intent not to seal the same would be a declara-
tion of an intentional fraud. In such condition of the record
the Court should have decreed a reformation of the instru-
ment."

In the case of *Smith* v. *Allen et al.,* 1 N. J. Eq. 43, the con-
tention was that the condition of the bond which was sought
to be reformed was larger than the statute required or author-
ized, and that therefore the bond was void, but the Court
held, quoting from the syllabus: "When the proof of a mis-
take is full and satisfactory, equity will relieve, even against
securities; and that as well where the complainant seeks
relief affirmatively, on the ground of the mistake, as where
the defendant sets it up to rebut an equity." In the very
recent case of *Aetna Indem. Co.* v. *Railway Co.,* 112 Md.
389, this Court, speaking through CHIEF JUDGE BOYD, said:
"We can have no special difficulty about the right of an
obligee to have a bond corrected in equity, even against a
surety, when the principal has by mere oversight not exe-
cuted it, after it is given to the principal by the surety to be
executed and delivered to the obligee—provided, of course,

the circumstances are such as would justify a Court of equity in reforming an instrument of writing. If a surety executes such a bond, and gives it to the principal to be executed by him, and then to deliver it to the obligee, and the principal does so deliver it, having simply overlooked the fact that he had not executed it, and the obligee, believing it was properly executed and not observing that it had not been by the principal, placed it away for safekeeping with its papers, all three parties believing it had been regularly executed and intending that it should be, it would be a confession of a very limited power to do justice if a Court of equity would have to admit that it could not require the bond to be put in the shape it was intended and believed to be by all the parties, merely because one of them was a surety. But we do not understand the powers of a Court of equity to be so restricted." In each of the last four cases referred to in this connection the Court cites with approval the case of *Wiser* v. *Blachly,* 1 Johns. Ch. 607, where the bond given by a guardian was taken in the name of the People, instead of the infant, and where CHANCELLOR KENT said: "But as to the main point in this case, whether the surety is to be holden though the bond was taken in the name of the People instead of the name of infant, I have no difficulty in saying that it is within the ordinary jurisdiction of this Court to correct such a mistake by holding the party according to his original intention, and to consider the bond as taken to the infant. Where the intention is manifest, this Court will always relieve against mistakes in agreements. 2 *Atk.* 203; 1 *Ves.* 317. The case cited from *Prec. in Ch.* shows that the Court will do it in the case of a surety. Here it is admitted in the answer, and the bond itself is conclusive proof, that Vail intended to bind himself as security for Blachly, the guardian; and whether the bond was taken in the name of the infant or in the name of the people in trust for the infant, it is but matter of form and not of substance; it would be intolerable that such a mistake should prejudice or destroy the rights of the infant."

It follows from what we have said that there was no error in the ruling of the Court below on the demurrer, and that the judgment appealed from must, therefore, be affirmed.

*Judgment affirmed, with costs.*