STATE, use of THE MAYOR & CITY COUNCIL OF BALTIMORE, *vs.* LAMBERT S. NORWOOD, ELIZABETH SMITH, and J. M. TURNER.

There is no law requiring the clerk of the Court of Common Pleas to collect or receive for the Mayor and City Council of Baltimore, the five pounds tax on tavern licenses, imposed by the act of 1782, ch. 17, and his official bond, as clerk, is not, therefore, responsible for any sums he may have received on account of such tax.

It is the duty of the clerk of the Court of Common Pleas to collect the tax called "*jail fees*," imposed by the act of 1827, ch. 117, sec. 2, and his official bond is responsible for any sums he may have received on account of such tax; and the Mayor and City Council of Baltimore are the proper parties to sue his bond therefor, and not the "visitors of the jail of Baltimore city and county," incorporated by the act of 1831, ch. 58.

Any individual or body corporate, interested in a bond given by a public officer to the State, for the faithful discharge of official duties, may institute suit thereon in the name of the State, without authority expressly given for that purpose by the State.

Where, in a suit upon a bond with collateral conditions, the declaration did not assign breaches, and the parties *agreed* that "errors in pleading are waived, and either party may give in evidence such testimony as might be admissible in any form of pleading," there is no necessity to suggest breaches in the pleadings, or upon the roll, before the bond can be admitted in evidence.

CROSS-APPEALS from the Superior Court of Baltimore city.

This suit was brought on the 5th of May 1854, in the name of the State for the use of the Mayor and City Council of Baltimore, against Lambert S. Norwood and his sureties, upon Norwood's official bond as clerk of the Court of Common Pleas, dated the 29th of November 1851. This bond, which was duly *stamped*, was given to the State in the penalty of £5000, and contains, among others, the condition that Norwood, whilst he continues in office, "shall well and faithfully pay over to the treasurer of Maryland, all sums of money received by him for the use of the said State of Maryland, under the provisions of the constitution of the State of Maryland, or of any law now existing, or which may hereafter be passed, in the manner and at the time limited by such acts, without

23    v. 12.

fraud or further delay, and shall well and truly account for the same with the officer or persons authorized to receive the same, and the duties of his office, and all the other duties of his said office by law imposed, legally, duly and faithfully shall discharge, according to law, and the true intent and meaning of the acts of Assembly, in such case made and provided."

The *declaration* did not assign breaches. The defendants pleaded *nil debent*, upon which issue was joined, and the parties then made the agreement, in regard to waiving errors in pleading and admitting testimony, which is set out in the opinion of this court.

The object of the suit was to recover money which the Mayor and City Council of Baltimore, the equitable plaintiffs who brought the action in the name of the State, alleged to be due to them by Norwood, and for which they insist his aforesaid official bond as clerk is answerable.

In the course of the trial *four exceptions* were taken to the rulings of the court below, (FRICK, J.,) *one* by the equitable plaintiffs, and the *others* by the defendants. These exceptions and all the facts of the case are fully stated in the opinion of this court.

The verdict and judgment were in favor of the plaintiffs for $1785.32, with interest and costs, and *both parties* appealed. ·

The cause was argued before LE GRAND, C. J., ECCLESTON, TUCK and BARTOL, J.

*C. J. M. Gwinn, C. McLean* and *C. H. Pitts* for the defendants below:

1st. The question presented by the defendants' *first* and *third prayers*, is, whether the Mayor and City Council of Baltimore had a right to use the name of the State in entering a suit upon *this bond*, without authority from the State, even if it were conceded they had an interest in the bond? In the case of *McMechen vs. Mayor & C. C. of Balto.*, 2 *H. & J.*, 41, it will be observed that the bond sued on was one in which the corporation had no direct pecuniary interest, and yet even here the authority of the equitable plaintiff to use the name

JUNE TERM, 1858.                179

State, use of Mayor & C  C. of Balto., vs. Norwood, et al.

of the corporation, was held by the court to be *intended after verdict*, upon the theory that it was not necessary to spread the warrant of attorney to him from the corporation, upon the record. But this case admits that the *authority* must exist at least by *intendment*. In a case of the same name, 3 *H. & J.*, 534, the reasoning of the court is not given, but there was proof in the case that the Mayor had given instructions to the register to deliver copies of the bond put in suit to any person having claims against the principal upon it. So that this case also does not show that authority to sue upon such a bond was not necessary to be given. In the cases of *Kiersted, Morrow,* and *Chamberlain vs. The State,* 1 *G. & J.,* 231, the name of the State was used in suits upon the bonds without authority, but, as under all the insolvent laws up to that time, there was no provision made for taking these bonds in the name of the State, and as the State had no interest in them, and its name was used as that of a convenient *representative* party, it is evident there was no reason for requiring its consent to the use of its name. So, too, in the case of *Ing, et al., vs. The State,* 8 *Md. Rep.,* 295, the suit was on an *appeal bond,* in which the State had no interest whatever, but was a nominal and representative obligee alone. These cases do not present the case of a bond made to the State, in which it is directly and pecuniarily interested, and of which it maintains the custody under the law. In such a case, it is essential to the safe maintenance of that priority in the payment of debts which is possessed by the State, (*State vs. Bank of Maryland,* 6 *G. & J.,* 226,) that no suit should be allowed to be instituted upon any security in which the State is directly interested, without the consent of the State. For the State may have good reasons for holding back from the commencement of suit, but if another party directly or indirectly interested in the bond made to it, and who has not the custody of that bond, may nevertheless put it in suit without the consent of the State, the State, as holder and obligee, may often be driven to injudicious haste, in order to avoid losing its priority at common law, or under the act of 1778, ch. 9. The true rule in cases in which the State is interested in the bond made to it as obligee, but which is

sought to be put in suit by a private party, in the name of the
State to his own use, is given by *Chief Justice Marshall*, in
the case of *The Corporation of Washington vs. Young*, 10
*Wheat.*, 406, to which the attention of the court is particularly
called, because the chief justice speaks of the earlier Maryland
cases upon this subject.   The rule is this: "No person who is
not the proprietor of an obligation, can have a legal right to
put it in suit, unless such right be given by the Legislature;
and no person can be authorized to use the name of another
without his assent, given in fact or by legal intendment."
Here the legal intendment after verdict does not exist, because
the question of the right to sue is directly raised by the prayers
which were rejected by the court.

2nd. That the court erred in admitting the bond in connec-
tion with the list of *jail fees*, as evidence of the responsibility
of the sureties and principal under the bond.   In public bonds
of this character, given to the State, but in which another party
professes to be interested, and sues in the name of the State,
as equitable plaintiff, such equitable plaintiff (the right to sue
being conceded) is to "be regarded as the real plaintiff," (8
*Md. Rep.*, 295,) and no evidence is admissible in favor of the
claim, therefore, which does not show a right vested in the
equitable plaintiff, and a responsibility to such equitable plain-
tiff on the part of the obligors.   It is not enough to show that
there is a responsibility to *somebody*, in order to make the evi-
dence admissible.   In this case the right to these *jail fees* was
not legally in the Mayor and City Council of Baltimore, and
they had, by law, no right to receive them, and, therefore, the
evidence was improperly allowed to be given.   The act of
1827, ch. 117, sec. 2, provides that no person shall be allowed
to sell liquors by retail, unless he shall pay to the clerk there-
for, in addition to the sum required for his license, the further
sum of four dollars for every such license, "the said further
sum to be applied to the payment of the expenses of the jail
of the said city and county of Baltimore, so far as the same
are chargeable to, and to be borne by, the city of Baltimore."
Now the question is, who had the right to receive and apply these
jail fees, as indicated in this act, for the act itself is silent on this

subject? By the act of 1831, ch. 58, sec. 1, the Visitors of Baltimore city and county jail were instituted a body politic and *corporate*, with power to exercise all the rights and privileges of a corporate body as fully as any other corporate body could exercise them. By the same act, sec. 15, they were directed to make out an accurate account of all the public money received by them from the register of the city of Baltimore, or from any other source, for the use of the city of Baltimore; and by sec. 13, they are charged with the whole revenue of the jail. The act of 1838, ch. 75, does not change the corporate character, or the duties of this body of visitors. Now, since these visitors exercise a corporate privilege as great as that which is possessed by the city of Baltimore, and are placed by the law exclusively in charge of the revenues appropriated to the use of the city and county jail, and since this was a special fund, to be appropriated to the single purpose of these expenses, these visitors ought to have been the equitable plaintiffs, and *not* the Mayor and City Council of Baltimore; the latter having no other right in regard thereto than the benefit which, under the act of 1827, ch. 117, accrues to them from the appropriation of the sum derived from the liquor license to the partial payment of the expenses which they were liable for on account of said jail. And, generally, it may be said that the securities to this bond "cannot be answerable beyond their engagement," (2 *H. & J.*, 45,) and it is plain that by this bond the engagement is to the State, or its officer, and to none other, and this view excludes the responsibility for those fees on this bond.

3rd. The appeal of the equitable plaintiffs presents the question, whether it was the duty of Norwood, as clerk of the Court of Common Pleas, to collect the money for the *ordinary licenses?* The first act which relates to licenses for ordinaries, is that of March session, 1780, ch. 24, which makes no provision for the payment of any portion of the fees derived from such licenses to Baltimore town. This act was defective, because it did not determine *who* were to receive these fees, or to account for them to the State. The act of June 1780, ch. 8, sec. 9, provided for this omission, by making it the duty of the

clerks of the county courts to receive and account for the moneys received for ordinary licenses to the State treasury. There was no provision at this time for the payment of any tax or fee on such license to any other than the State. The law of November session, 1782, ch. 17, sec. 1, which was an act for the more effectual paving of the streets of Baltimore town, provided for the levy of several special taxes which were to be appropriated to this purpose. Among these were taxes on riding carriages, wagons, carts, and *an additional tax of five pounds on tavern licenses*. By the same act, sec. 18, the *special commissioners* who were incorporated by the 45th section thereof, were given full power to appoint a person or persons, properly qualified, to act in the collection of said taxes, of which this very tax on ordinaries was one, and it is, therefore, manifest that under *this* law it was not the duty of the clerks of the county courts to receive these taxes, and therefore not their duty to receive this tax on ordinaries *in their capacity as clerks*. There was no omission *in this law* of care to provide for the proper payment of the moneys thus collected, for the good conduct of these agents is enforced by the same act, *secs*. 20, 22, 23. There was nothing in this act to prevent the special commissioners from appointing the clerk of the county court their collector, if they saw proper, but it is evident that if they did, he was responsible, under the law, *as collector, and not as clerk,* for the license money that thus came into his hands. By the act of 1796, ch. 68, erecting Baltimore town into a city, the powers of these special commissioners were vested in the corporation, and from that day to the present time, the law relating to these taxes or ordinary licenses has been left untouched; that is, the Mayor and City Council have the power to appoint a collector for this tax, and to hold him to an accountability, under the law of 1782, ch. 17, but under this law it is not, and when these taxes on ordinaries were received by Norwood, it was not, the province or the duty of Norwood, as clerk of the Court of Common Pleas, (to the clerk of which court came in due time the right to issue licenses for ordinaries,) to receive this tax or license for ordinaries. The acts of 1822, ch. 217; 1827, ch. 117; 1831, ch.

298; 1841, ch. 40; 1852, ch. 308; and 1853, ch. 444, leave the state of things as they existed in 1782, unaltered. The corporation has neglected to provide for its own security, and it cannot visit this omission upon the securities to this bond, who are responsible only to the extent of their engagement.

*B. C. Presstman* and *G. L. Dulany* for the Mayor and City Council of Baltimore:

The defendants below, by *their first exception* in this case, object to the ruling of the court below, admitting in evidence the bond sued on, because, as they insist, the name of the State cannot be used by the equitable plaintiff without her consent being given. This position is novel in its character, as the practice of using the name of the State in actions upon public bonds, by the parties interested, has hitherto been unquestioned. The State, by legislation, has guarded herself against the imposition of costs, by requiring *"the use"* to be entered by the clerk of the court. *Act of* 1794, *ch. 54, sec.* 10. The cases of *McMechen vs. Mayor & C. C. of Balto.*, in 2 *H. & J.*, 41, and 3 *H. & J.*, 534, referred to by the defendants' counsel, do not lend any sanction to the denial of this right, but, on the contrary, sustain it, though the arguments of counsel, similar for the most part to those now urged by the defendants, would apply more strongly to actions of the character of those suits, which were brought without authority in the name of the Mayor and City Council of Baltimore, by parties interested in an auctioneer's bond, than to public bonds given to the State. Neither is there much force in the supposition of the defendants, that because the Mayor had, in one of those cases, ordered copies of the bond to be given with a view to suit, that, therefore, the consent of the Mayor and City Council might be assumed by intendment. This is, perhaps, an ingenious and plausible theory, but as the court has not so said in their opinion, and as it does not appear among the points urged by counsel, we do not think it had a controlling influence in the decision pronounced by the court. In truth, had it been necessary to establish the authority or assent of the corporation to the institution of such suit, under the

limited powers prescribed to the executive officer of the city, his assent, merely, would not have been sufficient.

The defendants, in *their second exception*, object to the ruling of the court, admitting the bond in connection with the list of *jail fees*, because, as they contend in argument, the right to these *jail fees* was not legally in the Mayor and City Council of Baltimore, but was vested in the visitors of Baltimore city and county jail. Although this objection, if sustained, is but of a technical character, and will not defeat substantially the plaintiffs' claim, yet we do not think it entitled to much force. These *jail fees* being intended to lighten the expenses of the city and county in support of the institution owned jointly by the city and county, and constituting but a small part of such expenses, have been at all times paid into the city treasury directly by the State's officer holding the post of clerk of the City Court of Baltimore, who, prior to the new constitution, which has conferred the power upon the clerk of the Court of Common Pleas to "issue all marriage and other licenses required by law," was authorized to receive this license money. The Mayor and City Council have provided in their ordinances for the receipt by the register of all license money, and being clothed with authority to pass all ordinances requisite for the purpose of carrying into effect the powers conferred upon the city, they have enacted ordinances prescribing the mode of appointing visitors to the jail, and the power of removal or substitution of these officers by the Mayor and City Council, has never been questioned, and in all their acts they set forth their agency. See *Act of* 1838, *ch.* 75, *secs.* 1, 2, and *Revised Ordinances* 1850, *No.* 8.

The plaintiffs below, in *their exception*, object to the ruling of the court excluding the testimony by which it was proved that Norwood had received $14,613.95 for licenses for ordinaries, and that this sum had not been paid into the city treasury. Now it is conceded by the defendants that the Mayor and City Council of Baltimore are entitled, under the law of 1782, ch. 17, to these taxes on ordinaries, but they insist that if the clerk of the Court of Common Pleas collected them, his sureties are not responsible on his bond. We refer the

court to the *4th Art. of the Constitution, sec.* 15, in which the authority is given to the clerk of this court to issue "all marriage and other licenses required by law," as clearly conferring upon him, alone, the right to receive the money arising from ordinary licenses, and it would not have been competent for the Mayor and City Council of Baltimore to provide for the appointment of any other collector. All acts of Assembly inconsistent with this provision are repealed. Independently of this liability under the constitution, we refer to the case of *Laurenson vs. The State,* 7 *H. & J.,* 339, as affirming the doctrine that no principal or surety upon a collector's bond can escape from responsibility for moneys collected by the principal, by virtue or color of office.

ECCLESTON, J., delivered the opinion of this court.

The suit in which these cross-appeals have been taken, was instituted in the Superior court of Baltimore, in the name of the State use of the Mayor and City Council of Baltimore, against Lambert S. Norwood, Elizabeth Smith and Joshua M. Turner, on the 5th of May 1854. The object of the suit was to recover money alleged to be due the equitable plaintiffs, under a bond dated the 29th of November 1851, given to the State by Norwood, as clerk of the court of Common Pleas for the city of Baltimore, the penalty of the bond being five thousand pounds.

The declaration is in the form commonly used in suits upon bonds with collateral conditions, when breaches are not assigned by the *nar.* Neither the original bond nor a copy thereof was filed with the declaration. The defendants pleaded *nil debent,* to which issue was joined, and the parties made the following agreement:

"It is agreed in this case that errors in pleading are waived, and either party may give in evidence such testimony as might be admissible in any form of pleading, and that a copy of the bond may be offered to have the same effect as if the original was produced, the testimony to be taken subject to exceptions."

At the trial of the cause, the first bill of exceptions was taken by the equitable plaintiffs. They offered in evidence an ac-

24    v. 12.

count or list of ordinary licenses, marked and returned to the city register's office by Lambert S. Norwood, clerk of the court of Common Pleas for the city of Baltimore, showing that the amount which he charged as due the city, and remained unpaid, from May 1st, 1853, was $14.613,95; which list or statement, the parties agreed should be used in lieu of the original lists. And the plaintiffs proved by J. J. Graves, city register, that said account or list was returned by Lambert S. Norwood clerk of the Court of Common Pleas, and that the moneys received by him, as set forth by him in said account, as having been received by him for ordinary licenses, had not been paid to the city treasury. To the admission of which account and evidence the defendants' counsel objected, contending that the plaintiffs had shown no title to said money, and that Norwood as clerk, was not bound to collect and pay over the moneys collected by him for ordinary licenses, which objection the court sustained. And upon this decision the plaintiffs' appeal is based.

They insist upon their right to recover from the defendants, money alleged to have been received by Norwood, as clerk of the Court of Common Pleas, for the use of the city of Baltimore, under the act of November session 1782, ch. 17. This act was passed for the more effectual paving of the streets of Baltimore town, and for other purposes; by which several special taxes were imposed. Among these were taxes on carts, riding horses, billiard tables, &c., and *"an additional tax of five pounds annually on tavern licenses."*

The 45th section of this act, made the then special commissioners a body corporate, by the name of "Special Commissioners for Baltimore Town." And the 18th section of the same act gave these commissioners "full power to appoint a person or persons properly qualified, to act as collector or collectors of the taxes before mentioned;" the tax on ordinary or tavern licenses being one of those "before mentioned," and not excepted out of the general authority given to such collector when appointed.

This tax and others were likewise authorized to be collected by distress, as may be seen by reference to the act of 1792, ch. 21.

State, use of Mayor & C. C. of Balto., *vs.* Norwood, *et al.*

By the law of 1796, ch. 68, Baltimore town was made a city, and all the powers then possessed by the special commissioners were conferred upon the new corporation. By this change, instead of the commissioners the "Mayor and City Council of Baltimore" became authorized to appoint a collector of the five pound and other taxes.

The act of June session 1780, ch. 8, sec. 9, is the first law, which, in terms, directed the clerks of the county courts to receive and account for moneys payable for ordinary licenses. The entire amounts to be received for such licenses, were then due to the State alone. Since 1780, different laws in regard to money *due the State*, for ordinary and other licenses in Baltimore, have made the same payable, at one time, to the clerk of the court of oyer and terminer, afterwards to the clerk of the city court, and then to the clerk of the court of Common Pleas.

The act of 1804, ch. 65, in the latter part of its 4th sec. provides, that the clerk of the court of oyer and terminer, "shall also receive all sums of money payable for any licenses granted in virtue of this act, and account for the same according to law, as the clerk of Baltimore county court is now required to do." We see nothing in this act which imposes any duty upon the clerk of the court of oyer and terminer, in relation to the tax now under consideration; believing, as we do, that it never was made the duty of the clerk of Baltimore county court to collect this tax.

With much care we have examined the laws generally, having any relation to ordinary and other licenses, and particularly those already mentioned, as well as the following: March session 1780, ch. 24, sec. 1; 1791, ch. 58; 1816, ch. 193, sec. 14; 1816, ch. 242; 1822, ch. 217; 1827, ch. 117; 1831, ch. 262; 1831, ch. 298; 1838, ch. 414; special session of March 1841, ch. 40; and 1852, ch. 308, the last clause of section 1.

This examination has not enabled us to find any direction or authority, given in express terms or by necessary implication, to the clerk of Baltimore county court, to the clerk of the Court of Common Pleas, or to the clerk of any other court, to collect or receive this five pound tax. And seeing that the

act of 1782, ch. 17, provides for its collection by a person or persons to be appointed for that purpose; and the act of 1792, authorises it to be collected by distress; we do not perceive either a necessity, or any authority, for so construing the laws on the subject, as to make it the duty of the clerk of the Court of Common Pleas to receive the tax.

If there was evidence showing that Norwood, whilst clerk of the court, was appointed a collector, as provided for by the act of 1782, such an appointment could not impose upon him any responsibility in his character as clerk; there being no law requiring the clerk, as such, to perform the duty. If, therefore, by virtue of any appointment from the Mayor and City Council, or in consequence of any arrangement or understanding between them and Norwood, he has been receiving this tax, he may be personally answerable for the same, but his official bond, as clerk, is not.

Believing these views to be correct, we think the city is not entitled to any portion of the claim relied upon in regard to ordinary licenses, under the act of 1782; consequently the plaintiffs' bill of exceptions shows no error on the part of the court below, and therefore, the decision appealed from by the plaintiffs will be affirmed.

In the further progress of the cause, the defendants took three bills of exceptions. The verdict and judgment being against them they appealed.

From the first of these exceptions it appears, that after giving in evidence the agreement already stated, with relation to waiving errors in pleading, and the admission of such evidence as might be given in any form of pleading, the plaintiffs offered a copy of the bond mentioned in the *nar*. By the condition of which bond, among other things, it is provided, that Norwood, as clerk of the Court of Common Pleas, should well and faithfully pay over to the Treasurer of Maryland, all sums of money received by him for the use of the State of Maryland, under the provisions of the constitution of the said State, or of any law then existing, or which might thereafter be passed in the manner and at the time limited by such acts without fraud or further delay, and should well and truly account for the

State, use of Mayor & C. C. of Balto., *vs.* Norwood, *et al.*

same with the officer, or person or persons authorised to receive the same, and the duties of his office, and all the other duties of his office by law imposed, legally, duly and faithfully should discharge according to law, and the true intent and meaning of the acts of Assembly in such cases made and provided. To the admissibility of this bond the defendants objected, but the court overruled the objection, and they excepted.

The defendants' second bill of exceptions, shows that the plaintiffs offered in evidence the following agreement:

"It is admitted, that by the list of jail fees marked Exhibit No. 1, returned to the city register's office, by Lambert S. Norwood, clerk of the Court of Common Pleas, it appears that the amount which he charges as due the city, and which remains unpaid from May 1st, 1853, to June 1st, 1853, is $1950.72, and it is agreed that this statement shall be inserted in the record in lieu of the original list."

And the plaintiffs offered evidence by John J. Graves, register of the city, that said account was returned by Lambert S. Norwood, clerk of the Court of Common Pleas for the city, and that the moneys received by him as appears by said account or list, were not paid to the city treasury. To which evidence the defendants objected, but the objection was not sustained by the court.

The defendants then asked three prayers, all of which were refused; upon which action of the court the defendants based their third exception.

The 1st prayer asks the court to instruct the jury, that there is no evidence in this cause to sustain the plaintiffs' right to recover in this suit.

The 2nd is, "that if the jury believe from the evidence, that a judgment has been recovered against the defendants or any of them, on the bond offered in evidence in this suit, then the plaintiff is not entitled to recover in this case, for any sum of money which they may find Lambert S. Norwood received under the act of 1827, ch. 117, sec. 2nd."

And the 3rd prayer is, "that upon the pleadings, agreement and evidence in this cause, the plaintiff is not entitled to recover in this suit."

State, use of Mayor & C. C. of Balto., *vs.* Norwood, *et al.*

Whilst considering the appeal of the defendants, it must be borne in mind, that in deciding the plaintiffs' appeal, we have said they have no right to recover under the bond in controversy, for any moneys received by Norwood, on account of ordinary licenses. This being so, it follows necessarily, that in regard to questions presented by the defendants' appeal, no claim on account of those licenses can be of any avail to the plaintiffs.

The only claim now to be examined is, how far the bond of the clerk, as such, is answerable for moneys received by him under the act of 1827, ch. 117, sec. 2, for what are usually called "jail fees."

This act directs the sum of *twelve dollars* to be paid to the clerk of Baltimore city court, for the *use of the State*, by every person or body corporate, applying for a license to sell goods, wares or merchandize in the city; and it provides, that such license shall not "authorize any person or persons, body or bodies corporate or politic, to sell or barter spirituous or fermented liquor, by retail or in quantities less than ten gallons, and not less than a pint, within the city of Baltimore, unless the person or persons, body or bodies corporate or politic, obtaining such license, shall pay to the clerk of Baltimore city court, in addition to the twelve dollars aforesaid, the further sum of *four dollars* for every such license; the said further sum to be applied to the payment of the *expenses of the gaol*, of the said city and county of Baltimore, so far as the same are chargeable to, and to be borne by, the city of Baltimore."

As the law directs the four dollars to be paid "to the clerk of Baltimore city court," no question like that, in reference to ordinary licenses, as to who was to collect or receive the same, can here be made. and inasmuch as the duties of that clerk, in regard to such matters, have been transferred to the clerk of the Court of Common Pleas, there can be no doubt but that his official bond is responsible for the jail fees. The defendants however contend, that admitting the bond to be answerable, still the present equitable plaintiffs are not the proper parties to institute the suit; because, if without the express authority of the State, any suit upon the bond could be sustained,

it could only be by making the "visitors of the jail of Baltimore city and county" the equitable plaintiffs. In support of this view, reference has been made to the act of 1831, ch. 58, the first section of which constituted these visitors a *body politic and corporate*, with "all the powers, authorities and privileges of a corporate body, so far as the same are necessary to a due discharge of their duties, as fully to all intents and purposes as any other corporate body might or could have and exercise." Among the duties and powers prescribed for these visitors by this law, the 13th section provides, that they "shall keep regular books of accounts, in which the whole expenses of the jail, whether for supplies, salaries of officers, repairs or incidentals, shall be distinctly stated, as also all the receipts and expenditures upon the different dockets, in such a manner, as that these accounts may show what is chargeable to Baltimore county, and what chargeable to Baltimore city."

The 16th section enacts, "that the said visitors shall annually make out a full statement of all the public money received by them from the register of the city of Baltimore, or from any other source for the use of the city of Baltimore, and the manner in which it has been expended; which statement shall be laid before the Mayor and City Council of Baltimore, together with an estimate of what will be necessary for the following year, the amount of which estimate shall be levied on the property in the city of Baltimore, and paid to the visitors of the jail."

It has been contended by the defendants, that the sections of the law, which have been mentioned, give to these visitors, and not to the Mayor and City Council, the right to demand and receive, directly from the clerk of the Court of Common Pleas, the jail fees made payable under the act of 1827. But we do not consider this a correct view of the subject. When that act was passed the visitors had no existence as a corporation. The Mayor and City Council, however, were then the corporate body, having the control and management of the affairs of the city. And as the law provided, that the fees in dispute should be applied to the payment of the expenses of the jail of the city and county of Baltimore, so far as the same

were chargeable to, and to be borne by, the city, we think the Mayor and City Council then had the right to demand those fees from the clerk, whose duty it was to collect them from persons obtaining licenses.    This right has not been transferred to the visitors, by any express language in the act of 1831, or by any necessary implication, so far as we have been able to discover, after a careful examination of its provisions.    In reference to money transactions, the principal powers and duties of the visitors seems to be, that they are to estimate what amount it will be necessary for the city to provide for each year on account of jail expenditures, and that the application and expenditure of the same shall be made under the direction of the visitors, the city authorities being required to provide for the amount so estimated.    And inasmuch as the duty of providing the means necessary to meet its quota of jail expenses, is imposed upon the city, it is but reasonable to suppose, the Legislature designed that the fees arising under the act of 1827, and thereby expressly directed to be applied for the relief of the city, in regard to its liability for a portion of such expenses, should go into the city treasury.    This we consider a correct interpretation of the intention of the Legislature, as manifested by the laws on the subject.    The Mayor and City Council, therefore, had a legal claim for the jail fees received by Norwood as clerk.

Admitting they had, still the defendants insist, that they cannot recover any portion of the fees in this case, unless it can be shown that the suit was instituted for the use of the equitable plaintiffs, by authority from the State given for that purpose.    But in our opinion, the decisions in Maryland fully establish the doctrine, that there is no necessity for obtaining permission or authority from the State, to institute such a suit as the present, upon the official bond of the clerk.

In *Kirsted, Morrow and Chamberlain, vs. The State, &c.*, 1 *G. & J.*, 248, the bond sued upon was taken in the name of the State, although no law expressly directed it to be so taken.    The bond was given by an insolvent petitioner, conditioned for his appearance to answer the allegations of his creditors.

State, use of Mayor & C. C. of Balto., *vs.* Norwood, *et al.*

Two other cases of like character with the one above stated, were argued at the same time, and the court decided them all in the same opinion. It is there said; "Another question insisted on by the appellants in the argument of this cause is, whether the appellees could sue these bonds for their use, there being no provision in any of the insolvent acts, to enable them thus to sue. This point we consider settled in this court, by the cases of *McMechen vs. The Mayor and City Council of Baltimore, use of A. Storey*, and *McMechen vs. The Mayor and City Council of Baltimore, use of Hollingsworth & Williams*, 2 *Harr. & Johns*, 41, and 3 *Harr. & Johns.*, 534. They were suits on an auctioneer's bond, taken under an ordinance of the city, which did not authorize any person in particular, to sue it. They were nevertheless sustained, and the judgment of the county court therein affirmed by this court."

This opinion it will be seen was delivered, between four and five years after the decision of the Supreme court of the United States, in *Corporation of Washington, vs. Young*, 10 *Wheat.*, 406, to which the defendants have referred.

In the case of *Ing & Mills, vs. State use of Lewis & McCoy*, 8 *Md. Rep.*, 294, the court say, "for a great length of time it has been the uniform practice in this State, in cases like and similar to the present, to institute the suit in the name of the State, causing the names of the parties for whose benefit it is prosecuted, to be endorsed on the writ and declaration." After speaking of the act of 1835, ch. 380, sec. 7, as providing that a court of equity may, in some cases, direct bonds to be taken in the name of the State, as obligee, which may be used by any person interested, as *public bonds* may, the court then say, "and even prior to the passage of the act of 1835, the Court of Appeals held, in 1 *Gill & Johnson*, 231, that the uniform practice, for twenty years, allowed persons interested to bring suits on bonds taken in the name of the State, although the acts of Assembly, under which they are required to be executed, contain no specific provision for making them to the State, or give to the party, in language, the right to sue. These references are sufficient to show the suit was properly brought.

25      v. 12.

There is no doubt that it is incumbent on the party suing on the bond, to show he has an interest in it before he could recover in a regular trial prosecuted to verdict."

The laws which provide for the execution of bonds, similar to the one before us, do not require them for the purpose of protecting the rights of the State alone. They are also designed to secure the faithful performance of official duties, in the discharge of which, individuals and corporations have a deep interest, and therefore they should have the privilege of suing such bonds for injuries sustained by them, through the negligence or mal-conduct of the officers. Such doctrine, in regard to public official bonds, we consider as having been long established in Maryland, whatever may be the law elsewhere. And entertaining these views we cannot agree with the defendants' counsel, in supposing the present equitable plaintiffs could not institute this suit, because they had not obtained authority from the State for that purpose. In addition to the Maryland cases, which have been cited, see also *State vs. Dorsey, et al.*, 3 *G. & J.*, 92, 93.

Under the agreement waiving errors in pleading, and allowing such evidence to be given as might be admissible in any form of pleading, &c., there was no necessity to suggest breaches in the pleadings or upon the roll. An agreement of this sort is to be found in the case of *Laurenson vs. The State, &c.*, 7 *Harr. & Johns.*, 339. There an objection to the pleadings, for the want of breaches, was relied upon, the suit being upon a bond with a collateral condition. The court held the objection to be fatal, unless cured by the agreement; which they thought was a very loose course of proceeding, but nevertheless the court sanctioned it, and held its true meaning to be a waiver, on both sides, of all errors in the pleadings, and to dispense with the necessity for assigning breaches.

The principles which have been announced in this opinion, we deem sufficient to show that the court did right in admitting the bond objected to by the defendants, in their first bill of exceptions; and that there was no error in overruling the defendants' objection to the admission of the evidence offered, as set forth in their second exception.

In our opinion, there is evidence tending to establish the right of the equitable plaintiffs to recover for jail fees, and therefore the court committed no error in refusing to grant either the first or third prayers of the defendants, stated in their third bill of exceptions. And their second prayer was properly rejected, because there was no proof in support of it.

We affirm the decisions in both appeals.

*Judgment affirmed.*

(Decided June 24th, 1858.)